IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-00040-LTB-MJW

KARIN P. TILLEY,

Plaintiff,

v.

AMERICAN CITY BUSINESS JOURNALS, INC.,

Defendant.

_____

**RECOMMENDATION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 77)**

_____

**MICHAEL J. WATANABE
United States Magistrate Judge**


        This matter is before this court pursuant to an Order of Reference to United

States Magistrate Judge issued by Judge Lewis T. Babcock on May 8, 2006.  (Docket

No. 11).

        Plaintiff, Karin Tilley, brings this action under Title VII of the Civil Rights Act of

1964, as amended, and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et

seq.*, claiming that the defendant, the American City Business Journals ("ACBJ"),

disciplined and terminated her because of her age and retaliated against her because

she opposed prohibited discrimination.[1]  (See Final Pretrial Order, Docket No. 114 at

2).  She began working at the Denver Business Journal ("DBJ"), an ACBJ publication,

_____

        [1]In Plaintiff's Response to Motion for Summary Judgment, plaintiff withdrew her
gender discrimination claim.  (Docket No. 91 at 38).

2

in 1992 as an Account Representative and later became a Senior Account Executive,

with her primary responsibility being selling display advertising in the DBJ.  According

to the plaintiff, she

> was a successful Account Executive, winning a number of awards.
> Management at the DBJ changed, however, and after [she] had a very
> successful year, her managers took actions that hindered her ability to
> sell advertising and to make as much money, including but not limited to
> assigning her categories of business (in other sales positions "territories")
> in which she could sell that had less sales potential than categories
> assigned to males and younger account executives, and otherwise
> treating her differently than younger account executives in the office and
> differently than a male account executive. [She] complained about
> prohibited discrimination within DBJ and to the corporate offices at ACBJ.
>
> In response to her complaints, managers at DBJ and ABCJ
> retaliated against her by, among other actions, disciplining her for
> fabricated reasons or for infractions for which others in the office were not
> disciplined, subjecting her to less favorable working conditions than
> others working for Defendant, and, finally, terminating her.
>
> During the relevant period here, the Defendant discriminated
> against [plaintiff] on the basis of her age by, among other actions, making
> comments adverse to older persons, holding [plaintiff] to different
> standards than other employees, for example requiring her to report to
> work and leave work on a set schedule, disciplining her for fabricated
> reasons or for infractions for which younger persons in the office were not
> disciplined, subjecting her to different and less favorable working
> conditions than younger employees, paying her less than younger
> account executives, and terminating her.
>
> Defendant's argument that it terminated [plaintiff] in October of
> 2003, allegedly for poor performance is simply a pretext for discrimination
> and retaliation, as demonstrated by, among other actions, adverse
> comments made about older workers, subjecting [plaintiff] to different
> working conditions than other employees, treating [plaintiff] differently
> than other non-complaining employees, and exhibiting a pattern of age
> discrimination and retaliation.

(Docket No. 114 at 3-4).

3

Now before the court for report and recommendation is the Defendant's Motion for Summary Judgment (Docket No. 77) and supporting brief and exhibits (Docket Nos. 78 and 80 [sealed exhibit]).  Plaintiff filed a response and supporting exhibits (Docket Nos. 91, 92, and 93 [sealed exhibits]).  Defendant then filed a Reply and more exhibits (Docket Nos. 120 and 122 [sealed document]).  With leave of court, plaintiff filed a Sur-Reply (Docket Nos. 134, 136 [sealed document], and 147), and defendant filed a Response to the Sur-Reply (Docket No. 152).  Plaintiff subsequently filed a proffer of purportedly new information (Docket No. 154), and defendant moved to strike that proffer (Docket No. 156), which by separate Minute Order today has been granted.  The court has very carefully considered the above-mentioned motion papers and exhibits thereto, the court's file, and applicable Federal Rules of Civil Procedure and case law.  The court now being fully informed makes the following findings, conclusions, and recommendation that the motion for summary judgment be granted.

Rule 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial." Robertson v. Board of County Comm'rs of the County of Morgan, 78 F. Supp.2d 1142, 1146 (D. Colo.

4

1999) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Mares v. ConAgra Poultry Co.</u>, 971 F.2d 492, 494 (10th Cir. 1992)).  "Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. . . .  These facts may be shown 'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings by themselves.'" <u>Southway v. Central Bank of Nigeria</u>, 149 F. Supp.2d 1268, 1273 (D. Colo. 2001), <u>aff'd</u>, 328 F.3d 1267 (10th Cir. 2003).  However, "[i]n order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible*. . . .  The nonmoving party does not have to produce evidence in a form that would be admissible at trial, but '"the content or substance of the evidence must be admissible."' . . . Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is "not suitable grist for the summary judgment mill."'" <u>Adams v. American Guarantee & Liability Ins. Co.</u>, 233 F.3d 1242, 1246 (10th Cir. 2000).  <u>See</u> <u>Wright-Simmons v. City of Oklahoma City</u>, 155 F.3d 1264, 1268 (10th Cir. 1998).

"Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response." <u>Southway</u>, 149 F. Supp.2d at 1273.  "The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . . Unsupported allegations without 'any significant probative evidence tending to support

the complaint' are insufficient . . . as are conclusory assertions that factual disputes

exist." Id.; Robertson, 78 F. Supp.2d at 1146 (citing Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250 (1986); quoting White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir.

1995)).  "Evidence presented must be based on more than 'mere speculation,

conjecture, or surmise' to defeat a motion for summary judgment." Southway, 149 F.

Supp.2d at 1274.  "Summary judgment should not enter if, viewing the evidence in a

light most favorable to the non-moving party and drawing all reasonable inferences in

that party's favor, a reasonable jury could return a verdict for that party." Id. at 1273.

The Tenth Circuit very recently summarized the burdens in an ADEA case as

follows:

> Under the ADEA, an employer cannot "discharge any individual . . .
> because of such individual's age." See 29 U.S.C. § 623(a)(1).  Thus, a
> plaintiff suing under the ADEA must prove that the challenged
> employment action was motivated, at least in part, by age. See Reeves v.
> Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 . . . (2000).  The
> plaintiff may carry this burden either by presenting direct evidence of the
> employer's discriminatory intent or by presenting circumstantial evidence
> creating an inference of a discriminatory motive using the tripartite
> McDonnell Douglas burden-shifting analysis. See Danville v. Reg'l Lab
> Corp., 292 F.3d 1246, 1249 (10th Cir. 2002).
>
> Under McDonnell Douglas, the plaintiff first bears the burden of
> proving a prima facie case of discrimination. McDonnell Douglas Corp. v.
> Green, 411 U.S. 792, 802 . . . (1973).  If the plaintiff successfully proves a
> prima facie case, the employer must articulate a legitimate,
> nondiscriminatory reason for the adverse employment action. Id.  Once
> the employer identifies a legitimate reason for its action, the burden shifts
> back to the employee to prove that the proffered legitimate reason was a
> pretext for discrimination. See Reeves, 530 U.S. at 148.  Of course, at
> the summary judgment stage, the parties bear burdens of production,
> rather than burdens of persuasion. See Timmerman, 483 F.3d at 1113.

Riggs v. Airtran Airways, Inc., — F.3d —, 2007 WL 2258826 (10th Cir. Aug. 8, 2007).

6

A prima facie case of discrimination consists of evidence that "(1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." Equal Opportunity Comm'n v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007).[2]

"Both Title VII and the ADEA forbid employers from retaliating against an employee when that employee takes action in opposition to a discriminatory practice." Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1122 (10th Cir. 2007) (citing 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d)). "In order to establish a prima facie case of retaliation, an employee must show that: '(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse action.'" Id. at 1122-23 (quoting Duncan v. Mgr., Dep't of Safety, 397 F.3d 1300, 1314 (10th Cir. 2005)). Furthermore, "[s]imilar to a discrimination claim, once the employee establishes a prima facie case of retaliation,

_____

[2]The Tenth Circuit has recognized, however, that

> [t]here exists some tension in our case law regarding what a plaintiff must establish as part of his or her prima facie case of discrimination. Some cases treat circumstances suggestive of discrimination as an element of a prima facie case; other cases treat the surrounding circumstances as part of the analytically subsequent inquiry into the employer's stated reason for the challenged action and the plaintiff's opposing demonstration of pretext. . . . Regardless of whether we analyze the plaintiff's evidence "in reference to the prima facie case or the business justification versus pretext inquiry, . . . if the court correctly concludes that the evidence of discrimination/pretext fails as a matter of law, summary judgment for the defendant is the proper result."

Equal Opportunity Comm'n v. PVNF, L.L.C., 487 F.3d at 800 n.5 (citations omitted).

the burden of production shifts to the employer to articulate a legitimate,

nondiscriminatory reason for the adverse employment action. . . .  If such a reason is

successfully articulated, the employee must then demonstrate that the employer's

proffered reason for the adverse action is pretextual." Id. at 1123 (citations omitted).

**UNDISPUTED FACTS**

Reviewing the motion papers and composing a summary of undisputed facts in

this case has not been an easy task.  In its Memorandum Brief in support of its

summary judgment motion, defendant provided a Statement of Undisputed Facts which

cited to deposition excerpts, exhibits, and other materials, after each statement.  Each

statement, however, was not separately enumerated.  (Docket No. 77 at 3-13).  In her

response, rather than responding to these statements, plaintiff instead stated that she

found "many of the [defendant's] supposedly 'undisputed fact' [sic] to be disputed" and

set forth her "alternative statement of undisputed facts."  (Docket No. 91 at 2).  In its

Reply, defendant asserts that plaintiff's presentation was procedurally improper and

that by doing so, plaintiff has not succeeded in creating a genuine issue of material fact

so as to preclude summary judgment.  Furthermore, defendant correctly notes that

many of the plaintiff's "undisputed" facts are demonstrably wrong, some are

argumentative and mis-characterize the cited deposition testimony or exhibits, yet

others rely on the testimony of plaintiff's co-workers whose testimony is not admissible

because of lack of foundation, hearsay, and speculation, and others are not supported

by any citations to the record at all.

After reviewing the motion papers, the court finds the following facts to be

undisputed.  Plaintiff began her employment with the defendant in March 1992 as a

Display Advertising Account Executive, and on May 13, 1993, she was promoted to the

position of Senior Account Executive.  About six months after she started working for

the defendant, Brad Segura was hired, also as a Display Advertising Account

Executive.  Both plaintiff and Segura were paid a 15 percent commission for the

advertisements they sold to local accounts.  By 1996, however, they were the only

Display Advertising Executives paid at that percentage.  By then, everyone else who

had been hired into the position was receiving a lesser percentage, typically ten

percent.  Plaintiff continued to receive 15 percent throughout her employment with

defendant.

　　　Defendant's Display Advertising Account Executives are assigned certain

"categories" of business/industries in which to try to sell advertising.  In 1998 or 1999,

when the Account Executive responsible for the technology category left the DBJ,

plaintiff requested and was given that category.  At that time, the technology industry

was booming, and with technology as her largest category, plaintiff's sales exceeded

$1 million, and she was named to the company's "Chairman's Club," and she made

"Chairman's Club" the following year too.

　　　In late 2000, however, that industry started to decline, and plaintiff's sales did

too.  In early 2001 she complained about what she thought was unequal distribution of

categories.  Plaintiff discussed realignment of categories with Denise Jendrusch, the

Advertising Director, for several months in 2001, and in May of that year, as a result of

plaintiff's complaints, Jendrusch redistributed some of the categories.  Plaintiff received

9

the CPA/Accounting category and some of the Management Consultants category, but plaintiff did not feel she had been given enough.  In December 2001, due to disputes between plaintiff and Account Executive Christina Valerio about which companies belonged to which categories, the technology and telecommunications categories were combined, and the combined list was split between them alphabetically.  Companies with names starting with A through M were assigned to Valerio, and the remainder were assigned to the plaintiff.  Plaintiff was unhappy with the combination and alphabetical division.  Ultimately, in February 2003, as a result of Valerio leaving DBJ and another Account Executive moving to a new desk, plaintiff was given all of these companies in this combined category with the exception of Qwest.  In September 2003, Jendrusch and the publisher, Scott Bemis, refused to assign Qwest to plaintiff when the Account Executive handling the account left.  As noted below, at that time, plaintiff had already received a written warning in February 2003 and a final written warning in August 2003 concerning her performance.

On August 9, 2002, plaintiff had a telephone conversation with ACBJ Human Resources Manager Libby Palmer during which plaintiff complained about what she felt was unfair distribution of categories and about Jendrusch, including that Jendrusch allegedly had told employees that plaintiff was leaving the DBJ.  Plaintiff also contends that during that conversation, she complained that she had been discriminated against. Defendant disputes that plaintiff raised a claim of discrimination.  Following plaintiff's conversation with Palmer, Bemis investigated the issue of Jendrusch's personal behavior and management style, and Jendrusch subsequently received a written

warning, which made no mention of purported discrimination.

DBJ has an Account Executive Standards of Performance, the first requirement of which is that the Account Executive meet his or her monthly revenue goal 90 to 100 percent of the time.  Plaintiff is familiar with those Standards of Performance.  At the beginning of every year, plaintiff and each of the Account Executives would individually put together a sales plan with Jendrusch, and the Account Executives would be evaluated based on that plan at the end of the year.  Those plans typically included revenue goals, revenue as against goal, new in-person sales calls per week, telephone sales calls per week, new contracts, and follow-up with leads.

In 2001, plaintiff had additional categories as a result of the redistribution that May.  Nevertheless, plaintiff failed to meet her sales goal for 2001.  Her goal was $585,000, yet she had revenue of $424,233, meaning she had a shortfall of $160,767 and met only 72.5% of her goal.  She did not meet her monthly revenue goals ten out of the twelve months that year.  Out of the six Account Executives, she was next to last, both in terms of revenue produced and revenue as a percentage of goal.

In 2002, her numbers did not improve.  Her goal was less than the previous year, yet she had lower revenue of just $356,259 against a goal of $517,500, which means she had a shortfall of $161,241 and made only 68.84 percent of her goal for the year.  Once again, she missed her monthly revenue goals ten out of the twelve months.  Out of the six Account Executives, she was last in revenue produced and next to last in revenue as a percentage of goal.  The Account Executive who came in last with respect to revenue as a percentage of goal, Michael Brannigan (age 47 at the time of plaintiff's

termination), produced $51,139 more revenue than plaintiff, but he achieved 67.67 percent of his goal, slightly less than plaintiff (his actual revenue was $407,398 versus a goal of $602,000).[3]

On February 5, 2003, plaintiff was given a written warning by Jendrusch which detailed the following list of expectations that plaintiff was required to meet in order avoid disciplinary action, including termination:

- make eight in-person sales calls per week (four of which must be new calls)

- make the necessary number of prospecting phone calls in setting up the four new calls

- write a minimum of two written proposals per week

- use ACT (a software program) to indicate all actions taken with respect to her prospects and active accounts, including indicating appointments, phone calls, notes from each contact, and action

- print out an ACT report daily which indicated notes, appointments, and actions for that day and give to Jendrusch by the end of the day

- have a minimum of two new contracts per month

- come within 80 percent of her January goal and 100 percent of her February goal

---

[3]Of the four Account Executives who were employed throughout the period of 2001-03, plaintiff ranked last in terms of overall percentage of goal achieved: Gauger (110.02%), Segura (91.10%), Branigan (84.60%), plaintiff (72.02%).  (Def.'s Ex. 15).

12

- turn in insertion orders, including Network insertion orders, before the space reservation deadline

- call in if she would not be in the office by 8:30 a.m., and if she was not in the office by that time, she was to be on an appointment

(Docket No. 78-19; Def.'s Ex. 17).  Plaintiff told Bemis and Jendrusch that she would try to accomplish the requirements set forth in the warning.

Plaintiff did not meet her sales goal in February, March, May, June, and July 2003.  She did meet it in April.  Her revenue through July was short of her goal by $73,419 (revenue of $163,581 versus her goal of $237,000).  In addition, plaintiff admitted that she had not met several of the other requirements of the February 5, 2003, warning.

On August 12, 2003, Jendrusch gave plaintiff a final written warning which required plaintiff to meet or exceed the following expectations or be subject to immediate termination:

- arrive to work no later than 8:30 a.m.

- make eight in-person sales calls each week with notes indicated in ACT (four of which must be to new prospects)

- give a Notes & History report from ACT to Jendrusch by the end of each day

- enter accurate notes into ACT regarding actions taken with prospects and accounts

- enter accurate information into the Sales Funnel report daily

13

- sell a minimum of $5,000 into the Book of Lists each week

- sign a minimum of two new 13-time or greater contracts each month

- turn in network insertion orders within 24 hours of receiving them

- meet local revenue quotas each month

(Docket No. 78-21 - Def.'s Ex. 19).  Plaintiff and Bemis signed that final written warning.

Thereafter, plaintiff did not meet her sales goals in August or September, and she did not comply with other requirements of the final warning.  For the ten months plaintiff was employed by defendant in 2003, plaintiff had achieved only 74.7 percent of her sales goal (revenue of $271,176 vs. her goal of $363,00 - making a shortfall of $91,824), and she missed her monthly revenue goals eight out of the ten months. After discussions with Jendrusch, Bemis decided to terminate plaintiff's employment. Plaintiff was 49 years old when she was terminated on October 7, 2003.

During 2003, the Corporate Marketing Director for ACBJ, Bob Silvy, made several visits to Denver during which he consulted with the DBJ, helped to set goals, worked one-on-one with the sales force, conducted group training and client seminars, and coached and mentored the sales force in an effort to increase revenues.  He was critical of plaintiff's performance in a written report to Bemis and Jendrusch after his April 28 to May 1, 2003, visit, stating:

> . . . I was very underwhelmed by [plaintiff's] field call, as well as our category review.  She doesn't have the hunger you need.  She makes too many excuses for why she doesn't have success. . . . [Plaintiff] just isn't excited about the opportunities at the Business Journal.  She appears to be simply showing up. . . .  She isn't following some of the conditions of

> her written warning, such as being in the office by 8:30AM.  It seems like
> you've both have gone beyond the call of duty to give [plaintiff]
> opportunities to succeed.  Her under-performance drains too much of your
> time and raises morale issues with the rest of the sales team.  I hope we
> can find a solution that open the door for a highly motivated sales pro to
> take over this desk.

(Def.'s Ex. 25).  After his August 13-15 visit, Silvy stated in an e-mail to Bemis and

Jendrusch, "I'm pleased to see a plan has been finalized to help [plaintiff] either make it

or leave the Journal."  (Def.'s Ex. 26).  Following his October 14-15 visit, he e-mailed

them, "I'm pleased you can now move forward on rebuilding [plaintiff's] desk and that

you've filled her opening, as well as Kent's."  (Def.'s Ex. 27).

Plaintiff filed her charge of discrimination with the Colorado Civil Rights Division

on April 7, 2004.

**TIME BAR**

It is well established that a charge of discrimination must be filed within 300 days

of the date of the alleged discriminatory action.  Haynes v. Level 3 Communications,

LLC, 456 F.3d 1215 (10th Cir. 2006), cert. denied, 127 S.Ct. 1372 (2007); Valencia v.

GEO Group, Inc., 2007 WL 628067 (D. Colo. Feb. 26, 2007).  Defendant first contends

that because the plaintiff did not file a charge of discrimination until April 7, 2004, any

alleged unlawful acts which occurred prior to June 12, 2003, are outside the applicable

300-day limitations period and thus are time-barred.  Therefore, according to

defendant, most of the matters of which plaintiff complains are time-barred, and the

only actionable adverse employment actions in this case are the August 12, 2003, final

written warning and plaintiff's October 7, 2003, termination.

15

Defendant notes the following with respect to the <u>Haynes</u> case.  The plaintiff was a sales manager who claimed that her male supervisor took accounts away from her and other female salespersons and gave them to a male salesperson, whom he also allegedly favored in other ways.  After plaintiff confronted her supervisor, he began to criticize her to customers and management.  Plaintiff utilized the company's open-door policy and complained about her supervisor's management style and lack of support. Shortly thereafter, her supervisor issued plaintiff a written warning, based upon her failure to meet her sales quota.  The following month plaintiff was placed on a performance improvement plan ("PIP"), and soon afterward she went on medical leave during which she was terminated as part of a reduction in force ("RIF").  Plaintiff was selected for the RIF pursuant to a company policy that provided that all employees on a PIP would be included in the RIF.  Judge Nottingham granted summary judgment in favor of the defendant, and the Tenth Circuit affirmed.  The Tenth Circuit began its analysis by identifying "the allegations that constituted an adverse employment action because such 'discrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*.  Each discrete discriminatory act starts a new [300-day] clock for filing charges alleging that act.'"  <u>Id.</u> at 1222 (emphasis added by defendant).  The court examined the plaintiff's allegation that her supervisor's removal of her accounts was discriminatory and rendered her unable to meet her sales quota.  The court held that each alleged discriminatory reassignment of accounts constituted an adverse employment action for which plaintiff was required to file a charge of discrimination.  Since plaintiff had failed to do so, any claim based on the

removal of her accounts was time-barred.  Id. at 1224.

In the case here, defendant thus asserts that as in Haynes, any complaints by

the plaintiff about the assignment of account categories are time-barred.  Defendant

notes that plaintiff began to complain about the category allocation in 2001, that in

response to plaintiff's complaints Jendrusch reassigned certain categories in March

2001, that in December 2001 Jendrusch made an additional category reassignment in

an attempt to resolve issues between the technology and telecommunications

categories, and that plaintiff did not file a charge of discrimination challenging these

account reassignments.  In addition, defendant contends that to the extent plaintiff

belatedly attempts to resurrect events from the 1990s as evidence of discrimination,

i.e., Segura, but not plaintiff, receiving the title of Associate Sales Manager and being

provided an office, such events occurred many years ago and unquestionably more

than 300 days before plaintiff filed her charge of discrimination in this case.  Therefore,

according to defendant, such matters are also time-barred.  Furthermore, defendant

asserts that as in Haynes, plaintiff cannot rely on these time-barred acts to establish

intent or pretext as to her termination.  Instead, defendant contends, the only timely

adverse employment actions that remain are those that occurred after June 12, 2003,

namely, the August 12, 2003, final written warning and the October 7, 2003,

termination.

Plaintiff, however, asserts that the facts in Haynes are different from those here

because in that case the plaintiff failed to establish any adverse action within the

applicable 300-day time period before the filing of an administrative complaint.  In

contrast, according to plaintiff, she is alleging several adverse actions within the

applicable 300-day time period, namely the August 12, 2003, final warning, the refusal

by Jendrusch and Bemis to assign plaintiff Qwest in September 2003, and her

termination in October 2003.  Furthermore, plaintiff contends that defendant further

improperly extends the <u>Haynes</u> holding by saying that no action occurring before June

2003 can even be used by plaintiff to establish intent or pretext.  Plaintiff instead

asserts that the Circuit said just the opposite when it stated, "Haynes is correct that the

statute does not 'bar an employee from using prior acts as background evidence in

support of a timely claim.'"  <u>Haynes</u>, 456 F.3d at 1223.  Plaintiff asserts that "[w]hat the

Court prohibited was the use [of] background evidence to establish a timely claim in the

first instance. [Plaintiff] is allowed to use actions occurring prior to June of 2003 to

establish the background for her claims.  Thus. [plaintiff's] claims are not time-barred."

(Docket No. 91 at 20).

   This court, however, agrees with defendant's argument that any alleged unlawful

acts which occurred prior to June 12, 2003, are outside the applicable 300-day

limitations period and thus are time-barred.  Therefore, the only possible adverse

employment actions that remain are the August 12, 2003, final written warning[4] and the

---

[4]The court notes that not all "performance improvement plans," such as what
was contained in the warning letter, standing alone are adverse employment actions.
<u>Haynes</u>, 456 F.3d at 1224.  Here, it does not appear that the placement of plaintiff on
such a plan constituted an adverse employment action because like the plan in
<u>Haynes</u>, it "had no apparent tangible effects other than the requirement she meet her
sales quota and a plan to assist her in her efforts."  <u>Id.</u>  Defendant, however, has not
asserted that the warning letter was not an adverse employment action.  <u>See</u> <u>Equal
Employment Opportunity Comm'n v. PVNF, L.L.C.</u>, 487 F.3d 790 (10th Cir. 2007)
(defendant conceded that the warning letter it issued to its employee was an adverse

18

October 7, 2003, termination.  As asserted by defendant, plaintiff has taken the quoted

language from <u>Haynes</u> out of context because she ignored the court's subsequent

language that "such background evidence cannot suffice to establish a timely [claim]

where [there is] no evidence of discriminatory purpose other than (at most) [a] discrete

time-barred decision . . . .   To decide otherwise would completely undo <i>Morgan</i>'s

insistence that each discrete discriminatory act starts a new clock for filing charges

alleging that act."  <u>Haynes</u>, 456 F.3d at 1223 (quotations omitted).  The Tenth Circuit

further stated that the plaintiff could not use her supervisor's "alleged intent in

performing time-barred discrete actions resulting in the PIP to attach discriminatory

intent or pretext to the termination decision based on a neutral policy."  <u>Id.</u> at 1227.  In

addition, the court noted in a footnote that plaintiff conceded that she had failed to meet

her quotas, blaming her poor sales on the prior time-barred removal of her accounts,

and the court concluded that "her allegations only underscore the fact that the PIP was

an inevitable consequence of the alleged prior adverse employment actions, for which

she did not file a timely charge."  <u>Id.</u> at 1227, n.14.

Therefore, this court further finds that like the plaintiff in <u>Haynes</u>, plaintiff here

cannot use any supposed discriminatory intent by defendant in performing time-barred

actions, such as the category reassignments,[5] resulting in the February 5, 2003, written

warning to attach unlawful intent or pretext to the August 12, 2003, final written warning

---

employment action despite the Circuit's rule in <u>Haynes</u>, and thus the court did not
address the issue).

[5]Plaintiff testified at her depositions that the category realignment was "mostly
done by September of 2001."  (Docket No. 78-3 at 44).

and the October 7, 2003, termination.  See Ledbetter v. Goodyear Tire & Rubber Co.,
127 S.Ct. 2162, 2169 (2007) ("A new violation does not occur, and a new charging
period does not commence, upon the occurrence of subsequent nondiscriminatory acts
that entail adverse effects resulting from the past discrimination. . . . [C]urrent effects
alone cannot breathe life into prior, uncharged discrimination; . . . such effects in
themselves have 'no present legal consequences.'").

## AGE DISCRIMINATION CLAIM

**Defendant's Assertions.**  Defendant asserts that plaintiff can present no
evidence that the August 12, 2003, final written warning or her October 7, 2003,
termination were because of her age rather than for the following legitimate, non-
discriminatory reasons:

> . . . The primary reason Plaintiff received the final written warning,
> and was ultimately terminated, was because she consistently failed to
> meet her sales goals.  Initially, she was put on a written warning on
> February 5, 2003, Ex. 17 because, during the two preceding years, her
> sales had fallen off dramatically.  For example, in 2001, Plaintiff had
> revenues of $424,232 as against her goal of $585,000 (a shortfall of
> $160,767), meaning she achieved only 72.5% of her goal for the year.
> Ex. 14, at ACBJ 002346.  She failed to meet her monthly revenue goals
> for ten out of twelve months in 2001.  Id.  Out of the six Account
> Executives, for the year, she was next to last, both in terms of revenue
> produced and revenue as a percentage of goal.  Ex. 15.
>
> Then, during 2002, she only had revenue of $356,259 as against
> her goal of $517,5000 (a shortfall of $161,241), meaning she achieved
> only 69% pf her goal for the year.  Ex. 16, at ACBJ 002352.  This was the
> case notwithstanding that Plaintiff's goal had been reduced in 2002 to
> $517,500, from $585,000 the year before.  Again, Plaintiff failed to meet
> her monthly revenue goals for ten out of the twelve months in 2002.  Id.
> Of the six Account Executives, for the year, she was last in revenue
> produced and next to last in revenue as a percentage of goal.  Ex. 15.

20

Moreover, Plaintiff had not been putting forth the effort in doing the kinds of things that would lead to sales, such as getting into the office on time, prospecting, making sales calls and proposals, and utilizing ACT, the contact management system at DBJ.  Ex. 17.  These were the types of activities that all of the Account Executives at the DBJ were expected to do, Ex. 9, and that had routinely been part of Plaintiff's performance plans in earlier years.  Exs. 10-13.

Unfortunately, even after she received the February 5, 2003, warning, Plaintiff's performance did not improve.  She failed to meet her sales goals every month between February and July, with the exception of one month (April).  Ex. 18, at ACBJ 002358; Tilley Dep. at 258:4-6, Ex. 2).  Year-to-date through July, her revenue was short of her goal by $73,419 (revenue of $163,581 versus goal of $237,000).  Ex. 18, at ACBJ 002358.  Further, she admitted that she had not met several of the other requirements of the February 5, 2003 warning.  Tilley Dep. at 258:7-261:8, Ex. 2.  Thus, Jendrusch gave her a final written warning on August 12, 2003, setting out a clear set of expectations and warning that if they were not met, she would be terminated.  Ex. 19.

However, after receiving this final written warning, Plaintiff's performance still did not improve.  She did not meet her sales quota in either August or September.  Ex. 18, at ACBJ 002358; Tilley Dep. at 277:3-12 (missed quota in September; did not recall if also missed it in August), Ex. 2.  *See also id.* at 273:23-274:16 (as of around September 3, 2003, Plaintiff concedes she was not hitting her quota "by a substantial percentage").  For the ten-month period during 2003 for which she was employed at the DBJ, Plaintiff had revenue of $271,176 against her goal of $363,000 (a shortfall of $91,824), meaning she achieved only 74.5% of goal.  Ex. 18, at ACBJ 002358.  This was true despite the fact that Plaintiff's goal had once again been reduced from the year before, to $363,000 for the first 10 months of 2003 from $417,500 for the same period in 2002.  *See* Exs. 16 & 18.  She missed her monthly goals eight out of the ten months.  Ex. 18, at ACBJ 002358.  Nor did she comply with the other requirements of the final warning.  *See* memos to file by Jendrusch of meetings with Plaintiff, 8/27/03, 9/9/03, & 9/18/03, Exs. 10, 21 & 22, respectively; Tilley Dep. at 264:6-268:18 & 269:22-278:9 (while Plaintiff did not specifically recall meetings on these dates, she did discuss these subjects with Jendrusch during this time frame), Ex. 2.  Thus, in early October, after discussions with Jendrusch, Bemis decided to terminate Plaintiff's employment.  Bemis Dep. at 55:1, Ex. 5; Jendrusch Dep. at 255:3-24, Ex. 4; Ex. 23.

21

(Docket No. 78 at 23, 19-21).  In addition, defendant asserts that plaintiff cannot "point to any similarly-situated under-forty Account Executive whose revenues declined so dramatically during the period 2001-03, and particularly, one who was placed on a written warning and who failed to comply with its requirements, but who was treated more favorably, i.e., terminated."  (Docket No. 78 at 23).

Defendant contends that the plaintiff cannot make out the second element of her prima facie case because she cannot show that her job performance was satisfactory. Even assuming, for the sake of argument, that plaintiff could make out that second element, defendant contends that plaintiff cannot meet her burden of establishing pretext given the undisputed evidence that plaintiff failed to meet her sales goals and otherwise comply with the terms of the February and August written warnings. Therefore, it is asserted that the plaintiff's age discrimination claim should be dismissed.

**Alleged Pretext.**  Plaintiff responds that the evidence in the record shows that the reasons for her termination are unworthy of belief and are a pretext for discrimination and that at a minimum, the facts in the record establish a genuine dispute of material fact as to the pretext and motive for her termination.

"A showing of pretext does not require a plaintiff to offer any direct evidence of actual discrimination. . . .  An employee may show pretext based on 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief."  Timmerman, 483 F.3d at 1113.  There are typically

22

three ways that a plaintiff makes a showing of pretext:

> (1) with evidence that the defendant's stated reason for the adverse
> employment action was false; (2) with evidence that the defendant acted
> contrary to a written company policy prescribing the action to be taken by
> the defendant under the circumstances; or (3) with evidence that the
> defendant acted contrary to an unwritten policy or contrary to company
> practice when making the adverse employment decision affecting the
> plaintiff.  A plaintiff who wishes to show that the company acted contrary
> to an unwritten policy or to company practice often does so by providing
> evidence that he was treated differently from other similarly-situated
> employees who violated work rules of comparable seriousness.

Green v. New Mexico, 420 F.3d 1189, 1193 (10th Cir. 2005) (quoting Kendrick v.

Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)).  "An employee is

similarly situated to the plaintiff if the employee deals with the same supervisor and is

subject to the 'same standards governing performance evaluation and discipline.' . . .

'A court should also compare the relevant employment circumstances, such as work

history and company policies, applicable to the plaintiff and the intended comparable

employees in determining if they are similarly situated."  Kendrick, 220 F.3d at 1232.

Arriving Late Without Calling.  Even though defendant states that the primary

reason for plaintiff's termination was her failure to meet her sales goals, plaintiff does

not address that basis for termination first.  Instead, plaintiff first contends that the

evidence establishes that defendant's contention that she came in late and did not call

is unworthy of belief and is a pretext for discrimination.  She claims there is evidence in

the record showing that she always arrived at work on time or called when she was

going to be late.  More specifically, she states that the receptionist, to who calls were

made when an Account Executive was going to be late, testified that plaintiff always

called when she was going to be late.  In addition, the Business Manager, the Events

Manager, and the Advertising Billing Administrator testified that plaintiff worked long

hours, including nights and weekends, and always called when she was going to be

late, and other employees testified that plaintiff was always at work early and stayed

late.  Plaintiff contends that the allegation that she came in late without calling was not

only blatantly false, but defendant used the false accusation as the basis for imposing a

standard upon her that was not imposed on any other Account Executive, that is, that

she always had to be in at 8:30 a.m. regardless of whether she had a sales call.

In contrast, plaintiff claims that the receptionist and others testified that Leigh

Gauger, a younger worker, was frequently late and that Jendrusch was frequently

inquiring as to her whereabouts.  The Business Manager testified that she reported

Gauger's violation of the time rules to Jendrusch, but no disciplinary action was taken

against the younger worker during the time in question.  Likewise, the Business

Manager testified that she reported Christine Valerio's violation of the time rules to

Jendrusch, but no disciplinary action was taken against the younger worker during the

time in question.  Finally, the Human Resources Director reported that there were

frequent complaints about Brad Segura being able to come and go as he pleased.

Plaintiff concludes that "[i]n short, it could be reasonably inferred that

[defendant] simply lied about [plaintiff] being late and not calling in on time.  Further,

the record establishes that [plaintiff] was disciplined for behavior in which younger

workers freely engaged without punishment."  (Docket No. 91 at 27).

Sales Calls.  Plaintiff next asserts that the evidence establishes that defendant's

24

contention that she failed to make the requisite sales calls is unworthy of belief and is a

pretext.  She claims that defendant has offered no proof that she did not make the

necessary in-person calls except self-serving "notes to file" prepared by Jendrusch.

Plaintiff states that the Advertising Coordinator testified that she had never run an in-

person sales calls report and did not routinely keep such records.  While defendant

produced one report showing plaintiff's in-person's calls during a certain week, the

Advertising Director did not recognize it, and defendant stated it could not produce any

other reports like it.  Plaintiff further contends that the number of in-person calls

required in the written warnings was artificially high and contrary to the policies

approved by defendant in the past.  Plaintiff notes that Brad Segura testified that most

clients wanted to communicate at that point by e-mail or phone, and plaintiff had always

done her "prospecting" for clients largely by phone, a practice specifically approved of

by Jendrusch.  Furthermore, in contrast to the requirements imposed on plaintiff,

plaintiff claims there were no similar requirements placed upon Leigh Gauger or

Christine Valerio, noting that there is testimony in the record that they sat back and

worked the business they already had and rarely prospected for new business by going

on sales calls.

Sales Performance.  Plaintiff next asserts that the evidence establishes that

defendant's contention that she was terminated because of poor sales performance is

unworthy of belief and is a pretext.  She claims that

> [t]he record shows . . . that meeting goals is an artificial and
> unreliable measure of performance, and that [plaintiff] did not miss more
> goals than other account executives.  First, sales goals are simply

incentives or wishes for future performance.  The evidence shows that they are missed more often than not:

> !    In 2002, Leigh Gauger Missed 7 months of goals.
> !    In 2002, Christine Valerio missed 8 months of goals.
> !    In 2002, Brad Segura missed 10 months of goals.

There was testimony that [plaintiff] was unconcerned when Leigh Gauger or Christine Valerio missed their sales goals.

Second, the evidence shows that [plaintiff's] sales goals were dramatically increased in comparison to other salesperson's goals in 2002:

> !    Leigh Gauger's goals were **reduced from those of 2001 by 4.1%** and she still missed meeting her goals seven (7) months out of twelve.
> !    Brad Segura's goals were **reduced from those of 2001 by 4.2%** and he still missed meeting his goals ten (10) months out of twelve.
> !    [Plaintiff's] goals were **increased from those of 2001 by 21.5%** and she missed her goals ten (10) months out of twelve.

The same was true of the first ten months in 2003:

> !    Leigh Gauger's goals were raised only .004%
> !    Brad Segura's goals were raised by only 4.3%.
> !    [Plaintiff's] gaols were increased by 23.5%

In fact, the goals set for [plaintiff's] younger replacement, Dennette Maez, were significantly lower than [plaintiff's] goals.

Thus, Ms. Jendrusch's contention that [plaintiff] was terminated because she missed her sales goals is unworthy of belief and simply a pretext for discrimination.

In fact, there is a genuine issue of material fact as to whether [plaintiff's] sales performance was really poor.  Raw numbers of sales are simply not sufficient to show performance in this context.  Account executives are assigned categories of businesses in which they can sell advertising in the Denver Business Journal.  Categories of businesses are ranked each year by the ACBJ by the amount of advertising they do in

business journals.

Certain categories of business advertise much more than others in a business-to-business journal. . . .  Rankings typically do not change much from year to year. . . .

In order to truly measure [plaintiff's] performance, one must take into account the potential of the categories of business to which she was assigned.  Once that calculation is done, it is apparent that [plaintiff's] sales performances was as good as other employees, with the categories, or earnings potential, that she had been assigned. . . .

(Docket No. 91 at 28-31).

<u>Unwillingness to Make Other Changes.</u>  Next, plaintiff contends that the evidence establishes that defendant's contention that she was unwilling to make other changes is unworthy of belief and is a pretext for discrimination.  She claims defendant has presented no evidence whatsoever that she failed to enter accurate information into the ACT database or the Sales Funnel Report, as directed, except for Jundrusch's statements.  Furthermore, plaintiff claims that in requiring her to do these actions, defendant treated her differently than other Account Executives, claiming there is evidence showing that management had problems with getting all of the employees to utilize the data entry software system, but no action was taken against other employees.  In addition, contrary to defendant's assertions that plaintiff got insertion orders in late, plaintiff states there is evidence in the record showing she was one of the better Account Executives in terms of getting them in on time.  She also claims that the requirement that she get them in within 24 hours of receiving them set a higher standard than any other Account Executive.  With regard to Book of Lists sales, plaintiff claims that by the time she was fired, she had made at least $25,000 in such sales and

claims she would have had more time to make additional sales had she not been terminated.  In fact, she claims that the Book of Lists goal was met by only one Account Executive in 2002.  Furthermore, she claims she was the only Account Executive disciplined for this failure.  She also notes that this goal was lowered for her younger predecessor.  Finally, with respect to being disciplined for not selling a requisite number of year-long contracts, she claims there is no evidence in the record to show how many she sold, and she contends that no other Account Executive was held to the standard imposed upon her.

Therefore, plaintiff claims "the reasons cited in Ms. Jendrusch's memo for terminating [plaintiff] are unworthy of belief.  Instead of chronicling real performance problems, the document chronicles a series of disciplinary actions that were based upon fabricated misperformance, and, then, that formed the basis for requirements that [plaintiff] meet different and higher standards than other account executives, such as Leigh Gauger, Christine Valerio, and Brad Segura. . . .   In short, [plaintiff] has offered sufficient evidence such that a reasonable jury could find the Denver Business Journal's proffered reason for terminating her - poor performance is a pretext for discrimination."  (Docket No. 91 at 34 & 35).[6]

_____

[6]In her pretext argument, and in other portions of her motion papers, plaintiff also claims that defendant "repeatedly lied" about discrimination with respect to plaintiff. Only one specific instance is claimed, namely, an alleged false record purportedly created by Bemis allegedly to conceal the fact that plaintiff had complained about discrimination.  In support of this argument, plaintiff points to deposition testimony by the Human Resources Director, Guntle, but that testimony merely shows that Guntle later recanted a prior statement she signed.  Importantly, Guntle never testified about any threats or directives to lie or that anyone forced her to sign the statement.  Instead, she signed the statement, which she later recanted, purportedly out of her own fear of

28

Age-related Comments.   Plaintiff claims that Jendrusch "often" made "numerous" negative comments about older people during the period at issue here. (Docket No. 91 at 8, 21).  Plaintiff also states that Jendrusch's negative remarks about older people included comments about plaintiff's "frumpy" clothes, an Account Executive becoming senile because of his age, an Account Executive's old man pants and cologne, an Account Executive being a "washed-up old biddy," plaintiff having a child at her age, and that Jendrusch would not support a certain applicant for the job of Account Executive because "he didn't fit the profile" because he was "too old."  (Docket No. 91 at 8, 22).

In addition, plaintiff claims that Bemis also made negative comments about older people, claiming that Account Executive Michael Branigan testified that Bemis refused to become a member of the Denver Rotary Club because the membership was "too old."  (Docket No. 91 at 8).

**Analysis.**   This court finds as follows.  Plaintiff has presented no direct evidence of defendant's discriminatory intent.  Therefore, the court has utilized the tripartite McDonnell Douglas burden-shifting analysis.  Even assuming plaintiff has established a prima facie case of age discrimination, the court finds that the defendant has stated a legitimate, nondiscriminatory basis for giving plaintiff the final warning letter and for her

_____

being terminated.  Furthermore, there is no evidence that Bemis had any knowledge that the signed statement may not be true.  The truth or falsity of Guntle's statement, however, is not a genuine issue of material fact that would necessitate denial of the pending summary judgment motion in view of the fact that defendant, while denying plaintiff complained of discrimination to Guntle, has recognized that plaintiff's contention that she made the complaint must be accepted as true for purposes of this motion.

termination, namely, her poor sales performance.  Furthermore, for the reasons stated below, this court finds that plaintiff has not made the requisite showing that the defendant's proffered legitimate, nondiscriminatory reason was a pretext for discrimination.

The evidence bears out defendant's allegation that while plaintiff was previously a successful salesperson at DBJ, her performance fell off beginning in 2001.  By the time of her February 2003 written warning, no other Account Executive consistently missed his or her goals by as wide a margin as had plaintiff, and after her first warning, plaintiff continued to miss her monthly goals every month except for one.  See Docket No. 80-2 at 11 - Def.'s  Ex. 15; Docket No. 80-2 at 20 - Def.'s Ex. 18 (sealed)).

Plaintiff does not dispute the defendant's "raw numbers" concerning her declining sales.  Instead, she tries to minimize the importance of sales goals and attempts to change the company's usual standard for tracking an Account Executive's sales activity, namely, reaching stated revenue goals,[7] by adjusting the "raw numbers" by factoring in her calculation of the "potential" of the categories of business to which she and the Account Executives were assigned.  By bringing up the purported unfair or discriminatory assignment of the categories, and thus what plaintiff perceives as the unfairness of how her goals were set, however, plaintiff is dredging up her time-barred grievance about alleged discriminatory assignment of categories.  As the Tenth Circuit has stated, "[u]nlitigated bygones are bygones."  Haynes, 456 F.3d at 1222.  See

---

[7]Plaintiff testified at her deposition that each year her performance was measured as against her meeting her monthly quota.  (Docket No. 78-3 at 42).

United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences.").  Furthermore, the court does "not ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them."  Riggs v. Airtran Airways, Inc., — F.3d —, 2007 WL 2258826, at *7 (10th Cir. Aug. 8, 2007).  "The reason for this rule is plain: [the court's] role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."  Id.    In addition, "a challenge of pretext requires [the court] to look at the facts as they appear to the person making the decision to terminate the plaintiff."  Kendrick, 220 Fed.3d at 1231.

The undisputed fact is that the plaintiff's revenue goals went down each year (in 2001 it was $585,000; in 2002 it was $517,500; and in the first ten months of 2003 it was $363,000 - compared with $417,500 for the first ten months of 2002). Nevertheless, plaintiff's actual sales missed those reduced goals each year by a large margin.  Plaintiff has herself admitted that she failed to meet her monthly sales quota for every month during 2003 except for two and largely failed to comply with the other requirements contained in the two warning letters.

While plaintiff argues that other Account Executives also missed their goals, but she was the only one who received a warning and was terminated, specifically pointing to Christina Valerio and Michael Branigan (see Docket No. 134-2, Sur-reply at 5),

31

defendant correctly asserts that this argument actually undermines plaintiff's claim of age discrimination.  Valerio was under 40 (32 as of the time of plaintiff's termination), and Branigan was over 40 (47 - nearly plaintiff's age).  Therefore, the fact that plaintiff was given a warning and the other two were not (despite their purported similar performance) does not show that plaintiff was treated differently because of her age because the defendant allegedly treated both an under-40 employee (Christina Valerio) and an over-40 employee (Michael Branigan) differently than the plaintiff.

Plaintiff also contends that she was treated differently than the younger Account Executives in several respects.  "Not every difference in treatment, of course, will establish a discriminatory intent.  Title Vii does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal.  It prohibits only intentional discrimination *based upon* an employee's protected class characteristics."  Kendrick, 220 F.3d at 1232.  Here, this court finds that the plaintiff has not shown pretext as a result of allegedly being treated differently from other, younger Account Executives by virtue of plaintiff being required to make a certain number of in-person sales calls per week, including new calls; making prospecting phone calls; making a minimum number of written proposals per week; utilizing the company's software program (ACT) to indicate all actions taken with prospects and active accounts; having an ACT report printed out daily and turned into Jendrusch by the end of the day; having a minimum number of new contracts per month; turning insertion orders in before the space reservation deadline; calling in if she would not be in the office by 8:30 a.m., and if she was not in the office by 8:30 a.m., having to be on

an appointment.  Unlike plaintiff, the other Account Executives did not have their sales

fall like plaintiff (notwithstanding reduced goals) and did not consistently fail to meet

their sales quotas by such a wide margin, and, therefore, none were on written

warnings like the plaintiff.  These specific work requirements, which were imposed upon

plaintiff in the two warning letters, were part of the plan established to assist her in her

efforts to meet her sales goals in view of her poor performance.  As defendant asserts,

"[b]y doing these things - being in the office on time, prospecting, makings sales calls,

and using ACT, the contact management software - an account executive shows that

she is making an honest effort to take the steps which should (hopefully) lead to sales,

and making quota, something Plaintiff consistently failed to do."  (Docket No. 120 at

14).  Thus, the fact that plaintiff had specific work requirements imposed following the

warning letters that may not have been imposed on the other Account Executives who

did not receive warning letters cannot be used to show pretext in plaintiff's case.

Differences in treatment explained by rational, nondiscriminatory differences in the

relevant employment circumstances do not create an inference of pretext.  Heslet v.

Westar Energy, Inc., 174 Fed. Appx. 434 (10th Cir. Apr. 5, 2006) (citing Kendrick, 220

F.3d at 1230)).  See Equal Opportunity Comm'n v. PVNF, L.L.C., 487 F.3d at 801-02

(no evidence that other employee's similar conduct interfered with their duties).

Furthermore, pursuant to defendant's Account Executive Standards of Performance,

these activities were required of all Account Executives, and they had routinely been

part of the plaintiff's performance plans in prior years.  (See Docket No. 78-11 - Def.'s

Ex. 9, 78-12 - Def.'s Ex. 10, 78-13 - Def.'s Ex. 11, 78-14 - Def.'s Ex. 12, 78-15 - Def.'s

Ex. 13).

With regard to the purported age-related comments cited by the plaintiff, this court agrees with the defendant that they are nothing more than "stray remarks," do not support plaintiff's age discrimination claim, and are insufficient to create a jury issue. "Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions." Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir. 1994). "A plaintiff must demonstrate a nexus exists between the allegedly discriminatory statement[s] and the company's termination decision." Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1140 (10th Cir. 2000). "A causal nexus can be shown if the allegedly discriminatory comments were directed at the plaintiff, her position, or the defendant's policy which resulted in the adverse action taken against the plaintiff." Rea v. Martin Marietta Corp., 29 F.3d 1450, 1457 (10th Cir. 1994). Plaintiff has failed to establish such a nexus here.

As noted by defendant, most of the remarks cited by the plaintiff here were directed toward persons other than plaintiff (purported comments by Jendrusch about Mike Branigan that he seemed to be getting more senile, wears old man cologne, and wears his pants way above his waist, which makes him look like an old man; about Marti Ernst that she was an old, washed-up woman or an old biddy; and about an unidentified job applicant that he did not fit the profile - he was too old). Defendant notes that it is unclear when these statements were made other than that Guntle said they occurred in 2003 or 2004; Marsh testified that the Ernst comment was made in late 2002 or 2003; and the Branigan pants comments was made in early 2004. Defendant

34

also correctly notes that plaintiff has provided no evidence as to the context in which

most of these alleged comments were made.  Moreover, plaintiff has shown no nexus

between such purported statements and the defendant's decision to terminate her.

Plaintiff raises only two comments Jendursch purportedly made about plaintiff

herself.  First, Marsh testified that Jendursch commented about plaintiff's "look" - "her

red lips, her jet black, dyed hair, her clothes, frumpy clothes.  The way she dressed."

Defendant correctly asserts that even assuming such a comment was made, "while they

may be viewed as somewhat catty or unkind, they are not probative of age

discrimination."  (Docket No. 120 at 20).  Second, Guntle testified that Jendursch

commented about how much energy plaintiff's son had, how difficult it must be to keep

up with him, and how she had no idea how plaintiff did it at her age.  This court agrees

with defendant that "such a comment is wholly innocuous and, in fact, cannot be seen

as anything other than a compliment, and a comment which is not necessarily

indicative of age discrimination at all."  (Docket No. 120 at 20-21).  In fact, as noted by

defendant, Guntle herself did not regard the comment as being age-related at the time

it was made.

Plaintiff also relies upon a comment allegedly made by Bemis (who is four years

older than plaintiff) to Branigan in 1996 or 1997, years before plaintiff's termination, that

Bemis did not want to join the Denver Rotary Club because the membership was too

old.  Defendant correctly asserts that "[e]ven assuming that Bemis made such a

comment, it is not probative of anything relevant to this case.  Bemis' comment would

appear to relate to the demographics of the Denver Rotary Club as compared with the

target demographics of the readership and advertisers of the [DBJ].  In any event, the

comment does not relate to any particular employee, or the employees in general, at

the [DBJ], nor has Plaintiff shown that it bears any nexus to her termination."  (Docket

No. 120 at 21).

Furthermore, all of the comments above cited by the plaintiff are "ambiguous in

the sense that [they are] susceptible to more than one interpretation; isolated, in the

sense [they were] only made once; and stray, in the sense that plaintiff has not shown

an adequate nexus between the remark[s] and [defendant's] decision [to terminate]

plaintiff[]."  Foster v. Ruhrpumpen, Inc., 166 Fed. Appx. 389, 392 (10th Cir. Feb. 13,

2006).  See Heslet v. Westar Energy, Inc., 174 Fed. Appx. 434 (10th Cir. Apr. 5, 2006)

(Remark made by supervisor, almost a year before plaintiff's termination, that

defendant was looking to get rid of older guys, was too isolated and remote in time from

the employment decision to great a genuine issue of fact for a jury.)

In addition, plaintiff relies on e-mails written by Silvy (who is one year younger

than plaintiff) after his 2003 visits to the Denver market and his testimony with respect

thereto, noting that Silvy recommended that defendant get rid of plaintiff, Ernst, and

Branigan, who lacked the "fire" and the "hunger" necessary to be good salespeople.

Defendant, however, points out that neither Silvy's e-mails nor his testimony referred to

the ages of these three employees, only their performance, and he also offered

suggestions for the other (younger) employees as well and Jendrusch herself.  As

asserted by defendant, the only fair reading of the evidence presented shows that

Silvy's assessment of the performance of the defendant's Account Executives was

based on legitimate, non-discriminatory factors.  Moreover, Silvy was not a decision-maker for defendant.  <u>See</u> Docket No. 120 at 11 n.11 ("Silvy, who consults with the ACBJ's 41 business journals on sales and marketing matters, primarily as to professional and business development, does not have any operational authority.  In other words, neither Bemis nor Jendrusch report to him, either directly or indirectly. Silvy Dep. at 8:16-20; 13:7-14:21; Ex. 33 . . . .").

Finally, plaintiff relies on testimony of Michael Branigan (age 47 in 2003), claiming that he testified that he was terminated in 2004 because of his age, that he observed a pattern of terminating older employees and bringing in younger workers, and that he felt he was given less profitable categories than the younger Account Executives (Docket No. 91 at 7, 21).  However, defendant correctly notes the following with respect to Branigan's actual deposition testimony.  Branigan was not terminated; he resigned.  While he wondered whether age discrimination had been a factor with respect to his employment, he could not cite anything that supported his belief.  This belief, standing alone, is insufficient to preclude summary judgment.  <u>See</u> <u>Aramburu v. Boeing Co.</u>, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997) (subjective belief of discrimination is not sufficient to preclude summary judgment).  Furthermore, Branigan did not testify that he saw a pattern of DBJ and ACBJ terminating older workers.  He did testify that he did not see many people his age in the business and that management supposedly had a "pattern" of bringing in younger sales representatives, but he admitted that he was not involved with the hiring of these representatives and did not know the qualifications of those hired.  Defendant correctly asserts that "Branigan's vague,

general observations do not begin to rise to the level of 'statistical evidence' needed to support an inference of discrimination."  (Docket No. 120 at 24) (citing <u>Timmerman v. U.S. Bank</u>, 483 F.3d 1106 (10th Cir. 2007); <u>Sandoval v. City of Boulder</u>, 388 F.3d 1312, 1326 (10th Cir. 2004) (statement that few minorities and women were employed in upper management ranks did not, without more, prove claim of discrimination)).

In sum, this court finds that plaintiff has not demonstrated a genuine issue of fact as to pretext so as to survive summary judgment.

**RETALIATION CLAIM**

Plaintiff's second claim in this action is a retaliation claim.  She asserts that she filed a complaint of discrimination concerning Bemis and Jendrusch on August 9, 2002, during her telephone conversation with Libby Palmer, the Human Resources Manager at ACBJ's corporate headquarters, in Charlotte, North Carolina.  Plaintiff further asserts that at the next evaluation time, in Feburary 2003, Jendrusch and Bemis then gave her a poor evaluation and a written warning, that they gave her a final warning on August 12, 2003, and that they then terminated her in October 2003.  Plaintiff contends that

> [a] reasonable person could infer from those facts that Ms. Jendrusch knew about the complaint made by [plaintiff].  Although both Bemis and Jendrusch testified that Bemis did not tell Jendrusch that [plaintiff] had made a complaint, the evidence shows both to be incredible.  In any event, credibility is a matter for the jury.  Likewise, it can be inferred, from the facts in the record, that Ms. Jendrusch and Mr. Bemis embarked on a course of disciplining and, finally terminating [plaintiff] because of her complaints to ACBJ corporate headquarters.
>
> Again, the Denver Business Journal attempts to argue that it terminated [plaintiff] for poor performance, not out of a retaliatory motive.  As discussed above, that is pretext.

38

(Docket No. 91 at 37-38).

Defendant disputes that plaintiff made a discrimination complaint to Palmer, but for purposes of defendant's summary judgment motion, it recognizes that plaintiff's contentions must be taken as true.  Nevertheless, defendant correctly contends that the only actionable adverse employment actions are the August 13, 2003, final written warning and the October 7, 2003, termination, which occurred 12 and 14 months after plaintiff allegedly made her discrimination complaint.  Therefore, defendant correctly asserts that these actions are too remote in time from the protected activity to raise an inference of discrimination.  See Proctor v. U.P.S., — F.3d —, 2007 WL 2705344 (10th Cir. Sept. 18, 2007) ("Four months is too large a time gap to establish a causal connection."); O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three-month period, standing alone is insufficient to establish causation).  In addition, defendant contends that plaintiff can present no evidence that the final written warning or her termination were because of her complaint of discrimination.  In fact, according to defendant, plaintiff has no evidence that her direct supervisor, Jendrusch, even knew that it had been the plaintiff who complained about her or that plaintiff supposedly raised a complaint of discrimination against her in August 2002.  In addition, defendant asserts that there is no evidence that Bemis, the person who made the decision to terminate plaintiff, harbored any retaliatory animus toward plaintiff.  Defendant claims that to the contrary, the only evidence is that after plaintiff complained about Jendrusch in August 2002, Bemis investigated plaintiff's complaints, resulting in a written warning being

39

given to Jendrusch.  Defendant contends that plaintiff's retaliation claim must fail for

lack of support.  Defendant also asserts that even assuming plaintiff has made out a

prima facie case of retaliation, defendant has articulated a legitimate, non-

discriminatory reason for plaintiff's termination, and plaintiff cannot meet her burden of

showing pretext.  Therefore, according to defendant, plaintiff's retaliation claim should

be dismissed.

    Defendant correctly asserts that the plaintiff has effectively conceded that she

has no direct evidence that Jendrusch knew that it was plaintiff who complained about

her to the corporate office.  See Docket No. 78-4 at 16, 20-21 (Pl.'s Dep. - nobody told

her that Jendrusch had been informed that plaintiff had called corporate).  As shown

below, none of the testimony referred to by plaintiff in her response states that

Jendrusch knew plaintiff made a discrimination complaint.  Instead, plaintiff merely

argues that Jendrusch must have known or that such can be inferred from her behavior.

This court agrees that plaintiff has provided  nothing more than speculation, which does

not rise to a level sufficient to defeat a summary judgment motion on the claim.  See

Southway, 149 F. Supp.2d at 1274 ("Evidence presented must be based on more than

'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment.").

    In her Response, plaintiff notes that a Senior Consultant at ACBJ, Thomas

Woods, noted that he told Bemis to tell Jendrusch the next Monday about the

investigation he was doing.  Defendant asserts in response, however, that plaintiff has

not established a foundation for the admissibility of Wood's notes.[8]  In any event, even

taking the notes at face value, this court agrees that the notes do not state that Bemis

was instructed to tell Jendrusch that it was plaintiff who complained; instead, they

indicated only that he was instructed to tell her about his investigation.

Plaintiff also notes that she testified that immediately after she filed the

complaint, in a meeting with Jendrusch on August 12, 2002, Jendrusch started to treat

her badly, demonstrating a marked animus toward her.  Plaintiff claims her testimony is

supported by the testimony of the Human Resources director, who stated that after the

investigation, Jendrusch

would not communicate with [plaintiff] . . .   Would not talk to her. . . .
That was the change. . . . So her demeanor towards [plaintiff] significantly
changed. . . . It was obvious that she isolated [plaintiff].  She didn't pull
[plaintiff] in to have discussions with her or chitchat with her like she
would with the other account reps.  Not to say she wouldn't have
conversations with her on one-on-one or whatever–their meetings–but
there was no stopping by saying, you know, what are you doing today,
how's it going, did you call so and so–because she likes to have this
wonderful update of, you know, what the reps are doing–you know, in
passing.

She makes it a point.  She'll stop and yak to them and giggle and
laugh and talk, and talk about lunch and, yeah, why don't we go here, or
that sort of thing, but that – I mean, prior to that, there–it–you could see
her, she would talk to [plaintiff], she would stop by, or you'd see [plaintiff]
at the doorway standing, talking to her.  It was just apparent to me that,
after I had this conversation with [Bemis] and Libby Palmer, shortly after,
it was apparent that that stopped.  I–there was a point where I would
come out of my office, [plaintiff] would get up and she'd be waiting to go to
the front.  I'd be behind [plaintiff], [Jendrusch] would be in passing and
just glare at [plaintiff] with just a hateful look, and then she'd look at me
and say, How are you today? . . .

_____

[8]Defendant states that the man's correct name is Tom Wood.  (Docket No. 120
at 10 n.10.

41

. . .

Defendant, however, notes the following additional testimony by Ms. Guntle,

highlighted below, which shows the lack of meaningful evidentiary support for plaintiff's

claim:

> Q   So do you infer, from the timing of your conversation with [Bemis] and
> Libby and the significant change in [Jendrusch's] demeanor toward
> [plaintiff], that [Jendrusch] knew that [plaintiff] had complained about her?
>
> . . . [Objection]
>
> A   **I have no knowledge that she was actually spoken to**, but I would
> take a **great guess** that she was, especially with the cursing ceasing, like
> it did.

(Docket No. 91 at 36-37) (emphasis added).

In addition, plaintiff states that another Account Executive testified that it was

defendant's policy that complaints to corporate headquarters were referred to Bemis,

who then was to alert Jendrusch.  Defendant, however, quotes the testimony of Marti

Ernst, a classified advertising account executive, which shows that her testimony is

contrary to plaintiff's assertion in her Response:

> Q   And was that your experience, that if there was a complaint to
> corporate, that [Bemis] would be contacted, and then he would
> discuss it with [Jendrusch]?
>
> A   I don't have any experience to judge that on.  I do know that
> anything I spoke to [Bemis] about confidentially went directly to
> [Jendrusch].

(Docket No. 120 at 9-10 (quoting Ex. 32 at 212:1-7)).  Defendant further notes that like

plaintiff and Guntle, Ernst also admitted that she had no first-hand knowledge that

Jendrusch knew that it was plaintiff who had complained about her.  See Ex. 32 at

193:21-194:15.

In any event, defendant correctly asserts that even if plaintiff were to have raised a question of fact as to whether Jendrusch was aware that plaintiff was the person who complained about, plaintiff has provided no evidence of causation - that the adverse employment actions occurred because she complained of discrimination to the corporate office. There is absolutely no evidence that the final written warning and termination were motivated by retaliatory animus. As found above, causation cannot be presumed in this case because of the length of time between her purported complaint of discrimination in and the time of her warnings and termination.

Defendant also correctly notes that plaintiff has merely made the bald assertion that Bemis (who was the ultimate decision-maker regarding plaintiff's termination) was angry at her for having complained to the corporate office about Jendrusch. The undisputed evidence, in fact, shows that Bemis investigated plaintiff's complaints and issued a written warning to Jendrusch concerning her behavior. See Docket No. 80-2 at 2, Def.'s Ex. 8 (submitted under seal). Plaintiff has also not presented any evidence that Bob Silvy, the Corporate Marketing Director who criticized plaintiff's performance and lack of drive in his written report, had any retaliatory animus.

In sum, this court finds that no genuine issue of material fact exists as to plaintiff's claim of retaliation.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED that the Defendant's Motion for Summary Judgment (Docket No. 77) be GRANTED.

43

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have ten (10) days after service of this recommendation to serve and file written, specific objections to the above recommendation with the District Judge assigned to the case.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, Fed. R. Civ. P. 72(b), <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.  <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated:      September 20, 2007          <u>s/ Michael J. Watanabe          </u>
            Denver, Colorado             Michael J. Watanabe
                                         United States Magistrate Judge